UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 12-60273-CR-COHN

UNITED STATES OF AMERICA

vs.

ALFREDO CARRANZA,

        Defendant.

_____/

## FACTUAL STATEMENT IN SUPPORT OF PLEA AGREEMENT

The United States of America and the defendant agree that had this matter proceeded to trial the United States would have established beyond a reasonable doubt the facts set forth below. The parties further agree that the below factual proffer is a summary relating to the defendants' conduct and does not include every detail of the offense. In addition, the parties agree that the below recited facts are sufficient to establish the elements of the offense. The defendant agrees that the below facts were committed knowingly, willfully and intentionally.

1. In 2012, a confidential source (CS) provided information to law enforcement that Alfredo Carranza was involved in the sale of crystal methamphetamine. The CS placed a controlled, recorded call to Carranza and asked Carranza to ship to South Florida some of the methamphetamine he had available for sale so that the CS could show the methamphetamine to people here as a sample of the product available from Carranza. During the recorded conversations the CS discussed with Carranza how much was going to be shipped as a sample and the two agreed that Carranza would ship 14 grams. During these calls, Carranza put his girlfriend, who has been identified as Nicole Holguin, on the phone to discuss with the CS the manner in which the drugs would be shipped. To

that end, the CS and Holguin discussed concealing the methamphetamine in a cd case and shipping the case through fed ex. On route to mail the package Holguin, using Carranza's phone, called the CS and advised the CS that they were mailing the package and thereafter provided the CS with the tracking number. On August 22, 2012, the package arrived and contained approximately 14 grams of 99.9% pure methamphetamine. After the receipt of the package, Carranza and the CS spoke and Carranza provided the CS with a female's name, not Holguin, that the CS was to use to send payment for the methamphetamine through Western Union. Law enforcement sent $700 to Carranza using the name he supplied.

2. Thereafter, the CS introduced an undercover officer (UC) to Carranza and the UC began to deal directly with Carranza. The first phone call between with UC and Carranza occurred on August 29, 2012. During the call the CS introduced the UC to Carranza as one of the people here in South Florida and advised Carranza that the UC was trying to get "three ounces." The CS then handed the phone to the UC and the UC and Carranza spoke directly. The UC informed Carranza that the buyers loved the stuff that was sent before and that the group wanted to buy another 3 ounces. Carranza agreed to sell the 3 ounces and provided a bank account into which the UC was to deposit money for the drugs. On that same day, law enforcement officers deposited $2000 into the account. During this call, Carranza also provided the UC with a second phone number to be used to reach Carranza and Carranza stated that the phone number belonged to his girlfriend.

3. After the money was deposited, the UC called Carranza and left a message that the money had been deposited. Nine minutes later Holguin called the UC and advised the UC that Carranza was busy but that he received the $2000 and that she was preparing the 3 ounces of methamphetamine to send to the UC. The UC gave the female an address in Wilton Manors to send the methamphetamine. On August 30, the UC spoke with Carranza and stated to Carranza that he

2

had spoken to Holguin about the money and wanted to make sure that it was okay to speak to her. Carranza assured the UC that it was fine to speak with Holguin because she was his "right-hand girl." On that same day the UC spoke again with Holguin who advised that she had sent the package using UPS and that it would arrive at the address the following day by 10:30 am.

4. On August 31, 2012, the package arrived. It was examined and found to contain 83.8 grams of 97.7 percent pure d-methamphetamine hydrochloride. The UC called Carranza after receipt of the package to advise him that it had arrived. Carranza told the UC to deposit the payment for the methamphetamine into the account that he had previously provided on August 29. On August 31, law enforcement deposited $2,200 into the account.

5. Following the delivery of these packages, Carranza advised the UC that he wanted to meet with him face to face so that Carranza would know with whom he was dealing. On September 17, 2012, the UC met with Carranza in Las Vegas, Nevada. During the meeting the two discussed the fact that Carranza's methamphetamine was generally 98% pure because he did not cut it. Carranza advised the UC that he normally sells methamphetamine for $1200 an ounce in Nevada but because Carranza was having to ship the methamphetamine to FL he was adding $300 to the cost of each ounce. Carranza advised the UC that if the UC bought larger quantities of methamphetamine he would lower the price. During this same meeting Carranza showed the UC a fed ex receipt for a package destined for Morton, Mississippi. The UC was able to note that the weight of the package was approximately one and one-half pounds and that the shipping cost exceeded $100. The UC stated that receipt represented a 10 ounce methamphetamine shipment.

6. Following this meeting, Carranza and his girlfriend shipped methamphetamine to the UC 5 additional times. The packages arrived on September 27, October 13, October 17, October 25

3

and October 27, 2012.[1] As it relates to each of these shipments, the UC spoke to both Carranza and his girlfriend multiple times. In an effort to keep its costs at a minimum, law enforcement only sporadically placed money into Carranza's accounts. Specifically, they deposited $2500 into a Chase Bank account on September 25; they deposited $1000 into a Wells Fargo account on October 10; they deposited $2000 into a Chase bank account on October 16; they deposited $2000 into a Wells Fargo account on October 23; they deposited $1500 into a Bank of America account on October 31; and they deposited $1000 into a Bank of America account on November 1, 2012. All bank deposits were made into account numbers provided by Carranza. On several occasions Holguin discussed the deposits with the UC and confirmed the pairs' receipt of the money.

AGREED:

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 2·14·13      By: _____
                   JULIA J. VAGLIENTI
                   ASSISTANT UNITED STATES ATTORNEY

Date: 2/14/13      By: _____
                   RONALD CHAPMAN
                   ATTORNEY FOR DEFENDANT

Date: 2/14/13      By: _____
                   ALFREDO CARRANZA
                   DEFENDANT

---

[1] The drugs shipped on these respective days were submitted to the DEA lab for analysis. That analysis reflects the following: September 27 (112.5 grams, 97.5 % pure d-methamphetamine hydrochloride and 111.5 grams, 96.4 % pure d-methamphetamine hydrochloride ); October 13 (111.1 grams, 95.6 % pure d-methamphetamine hydrochloride); October 17 (111.4 grams, 92.1 % pure d-methamphetamine hydrochloride); October 25 (111.3 grams, 96.1 % pure d-methamphetamine hydrochloride), and October 27 (110.1 grams, 93.9 % pure d-methamphetamine hydrochloride).